Edwin Lees SHAW, as Personal Representative of the Estate of Gary Scott Shaw, deceased, Plaintiff,

v.

GRUMMAN AEROSPACE CORPORATION, Defendant.

No. 81–2295–Civ.

United States District Court, S.D. Florida.

Sept. 12, 1984.

Robert L. Parks, Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Miami, Fla., for plaintiff.

Francis A. Anania, Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ARONOVITZ, District Judge.

THIS CAUSE was tried to the Court non-jury. It is a case arising under the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* and Federal Admiralty Law, 28 U.S.C. § 1333. The Court has heard the testimony of the lay and expert witnesses, received numerous exhibits, examined the entire Court record, and has heard Oral Argument by respective counsel. Accordingly, there is herewith entered this Court's Findings of Fact and Conclusions of Law based upon the aforegoing.

### Findings of Fact

1. On December 12, 1979 at about 4:00 o'clock A.M., Navy Lieutenant J.G. Gary S. Shaw was killed when the Grumman A–6 aircraft he piloted, NG523, Bureau Number 151566 ("subject aircraft"), pitched violently and suddenly into the ocean about 100 miles off San Diego immediately after having been catapult-launched from the aircraft carrier Constellation. The crash occurred within two to three seconds after

launch and within several hundred feet forward of the bow of the Constellation.

2. Neither the bodies of Lieutenant Shaw and his bombardier-navigator Lieutenant Bates nor the wreckage of NG523 were ever recovered.

3. Plaintiff Edwin Lees Shaw, the father of the decedent, is the Personal Representative of the Estate of Gary Scott Shaw, deceased, and the estate is being probated in Dade County, Florida.

4. Grumman Aerospace Corporation is a citizen of the State of New York with its principal place of business in the State of New York. It also is authorized to do business in the State of Florida.

5. At all times material, Gary Scott Shaw was a resident of Fort Lauderdale.

6. At all times material, the subject aircraft was being used in a reasonably foreseeable manner for its intended purpose and Gary Shaw was a foreseeable user.

7. As a result of his death, Gary Shaw's widow suffered loss of his support and services; loss of inheritable estate he might have accumulated; and the expenses for his funeral. Their daughter, Kelly, lost the benefit of his support, services, nurture, guidance, and inheritable estate. The parties and their attorneys agreed and stipulated that these damages total $840,556.75, with the exception of certain possible deductions (VA benefits) and/or additions (pre-judgment interest).

8. An extensive Naval J.A.G. investigation into the accident was conducted by Lieutenant Commander John Schork, who was the assistant maintenance officer on board the Constellation at the time of the accident, and an eyewitness to the events.

9. The investigation included interviews with other eyewitnesses, ship's personnel and friends of Gary Shaw. It also included information gathered from the aircraft logbooks and records, the film of the fatal launch, and simulated tests of various possible breakdowns on the hydraulic flight systems trainer at Whidbey Island.

10. This Court admitted into evidence those portions of the Factual Findings made by Lieutenant Commander Schork in his authority as investigating officer. Although his opinions as contained in the Report (Plaintiff's exhibit 19) were not admitted verbatim as opinions expressed in the Official Report of Investigation, nevertheless he testified that if questioned on direct examination as to each opinion rendered therein, he would confirm and testify as stated. Rather than taking his exact testimony, plaintiff therefore adopted by reference his opinions while the witness was on the stand, questioned him further and then turned him over for cross-examination as to his testimony on the Factual Findings as well as his own opinions which coincided with the Report of Investigation. Lieutenant Commander Schork considered the following possible causes of the accident and rejected them as only remote possibilities: engine failure; catapult failure; problem with the flaps and/or slats; pilot incapacitated; runaway trim; suicide or disorientation.

11. Narrowing down the most logical reason for the crash to the uncontrolled leading edge of the horizontal stabilizer, Lieutenant Commander Schork considered the six most likely problem areas to be (1) loss of a locking bolt in longitudinal control system; (2) willfull tampering; (3) damages to the control system by a foreign object; (4) failure of a major structural member of the aircraft; (5) failure of a component or attaching structure in the longitudinal control system; and (6) malfunction of the electro-mechanical Automatic Flight Control System (AFCS). Willfull tampering and failure of a major structural member were considered by Schork to be unlikely. He termed damage by a foreign object and malfunction of the AFCS remote.

12. Based on all of the information gathered in his investigation, it was Lieutenant Commander Schork's opinion that the subject crash was due to either a loss or failure of hardware in the stabilizer actuation system. This conclusion was supported by the violent nose down pitch of the aircraft and the coincidence of stabilizer travel time during the actual launch as

filmed and those simulated on the A–6 trainer at Whidbey Island, when the bolt connecting the load release bungee to the walking beam was disconnected. Lieutenant Commander Schork then was not only an eyewitness, a participant in the flight exercises, an expert in his own right with regard to the subject matter of the crash, but he also prepared the Official Report of Investigation.

13. All of the evidence including the above investigation and the opinion of expert witnesses, support the conclusion that a disconnect in the longitudinal flight control system of NG523 caused failure of that system and, because there was no alternate means for the continuation of safe flight in the event of such failure, the aircraft became uncontrollable. The opinions rendered, each respectively by both of the Plaintiff's expert witnesses, Thomas Lombardo and Ira Rimson, are credible and seemingly well-founded. This Court accepts these opinions as relevant and pertinent toward establishing liability asserted by the Plaintiff herein.

14. Joseph Novak, the A–6 engineering manager, a Grumman employee, testified by deposition (Plaintiff's exhibit 13 at p. 107, line 3–14) as follows:

"...Q. And your basic opinion concerning the disconnect which caused this crash, did that come about through your reading of the Navy JAG report?

A. No, we had a fundamental opinion back right at the time of the accident. Had nothing to do with reading a JAG report.

Q. And that was based on the flight characteristics coming over the cat?

A. Our understanding of the report of the behavior of the airplane coming off the cat leads the opinion to be that there was a probable disconnect in the longitudinal control system..."

and again, Joseph Novak in Plaintiff's exhibit 13 at line 2:

"...A. The opinion I have is that of a disconnect someplace in the flight control system..."

That was the opinion rendered by the A–6 engineering manager for Grumman. In live testimony, when called by the Defendant, this witness attempted to recede slightly from this opinion but essentially confirmed it.

15. Lieutenant Commander Daniel Jorvig was an eyewitness to the tragic incident and at the time, he was a catapult arresting gear officer launching aircraft aboard the Constellation. He testified that in his opinion as the Shaw aircraft pitched down, he observed the leading edge of the stabilizer in an *up* position. This is consistent with a leading edge stabilizer up resulting in a nose pitch down as occurred here. This, therefore, was consistent in affording corroboration that the cause of crash was in the longitudinal control system which failed suddenly.

16. While evidence indicates that the disconnect occurred aft of the feel bungee by the walking beam at about Station 520, where it occurred is not relevant as the ultimate defect was lack of redundancy in the longitudinal flight control system.

17. The actual cause of the accident was the uncontrollable rotation of the longitudinal stabilizer to a leading edge-*up* position, which was the result of a design that did not incorporate any failsafe positions to preclude this uncontrollable travel by providing an alternate means of control in the foreseeable event of disruption of the nonredundant primary longitudinal control system, thereby creating a situation that was unreasonably dangerous.

18. The dangerous condition or defect in this system was the lack of control capacity on the part of the pilot in the event of a disconnect to prevent the migration of an essential part of his primary control system to a position which renders the aircraft completely uncontrollable and renders a crash certain to occur.

19. Grumman was and is engaged in the business of designing, manufacturing and selling aircraft such as the A–6.

20. In the course of its business, Grumman designed, manufactured and sold the aircraft KA–6D, NG523, Bureau No.

151566, to the Navy. It is a tanker version of the A–6; an attack aircraft.

21. The subject aircraft was expected to and did reach Gary Shaw without any substantial change in the condition in which it was sold, except such changes as were proposed by Grumman itself to cure the defective condition which is the subject of this litigation.

22. The subject aircraft was in a defective condition so as to be unreasonably dangerous to a user or consumer.

23. Grumman failed to use reasonable care in the design of the longitudinal flight control system of the A–6 aircraft.

24. Grumman knew or should have known that if the subject aircraft were not properly designed, manufactured and tested, there would be created an unreasonable risk to foreseeable users like Gary Shaw.

25. Grumman's lack of care resulted in an inherent design defect, *i.e.*, total lack of redundancy in the longitudinal flight control system so that in the case of a disconnect, the aircraft becomes uncontrollable; moreover, there is no warning device to alert the crew to the impending peril when such a disconnect does occur.

26. During the years since production of the A–6 had begun and prior to the Shaw accident, six other accidents or incidents had occurred.

27. Each of the previous six accidents involved a disruption of the longitudinal flight control system which occurred in such a way that the pilot was not able to maintain or retain control of the aircraft. In almost all of those cases the aircraft pitched in one dimension either uncontrollably up or down and two-thirds of them occurred during takeoff. These accident reports establish a history which would make Grumman aware of a defect in the longitudinal control system of the A–6.

28. Grumman chose to address the problem as a maintenance problem rather than as an inherent design defect. Grumman presented ECP's (Engineering Change Proposals) 731, 816 and 822 and their various amendments as solutions to the prob-

lem of catastrophic losses of aircraft and crew due to single point failure in the longitudinal system.

29. These ECP's proposed installation of self-retaining bolts at the many links points in the longitudinal flight control system. They were proposed by Grumman as its solution to the losses of crew and aircraft due to disconnects.

30. These ECP's were initially rejected by the Navy for fiscal reasons. ECP 822 was finally approved and Air Frame Change (AFC) 416 was issued by the Navy in February of 1978.

31. AFC 416 ordered retrofit of all A–6 series aircraft by installation of self-retaining bolts in their longitudinal flight control system. AFC 416 was divided into two parts (Part I and Part II) so as to permit early installation of the bolts at the points judged to be the most susceptible to failure, thus leaving the remaining bolts to be installed later.

32. Naval records and the aircraft logbook indicated that NG523 had undergone AFC 416 Part I in May of 1979, after which the aircraft logged 112.5—117.4 flight hours before the fatal crash. It would, therefore, appear that the failed bolt which caused the subject crash would have been of the new self-locking variety.

33. The Shaw accident demonstrates that the new bolts did not correct the defect in design.

34. The Navy provided generalized performance, mission and criteria specifications for the design and construction of the A–6.

35. As a result of competitive bidding in 1967, Grumman was awarded the contract to produce this aircraft and thereafter produced and submitted to the Navy its own detailed specifications represented by Grumman as fulfilling the criteria set by the Navy.

36. The Grumman specifications and drawings were routinely examined and approved by the Navy after which Grumman began production of the aircraft.

37. Pursuant to MIL–D–8706 (Defendant's Exhibit 1), paragraph 14.2.2.1, Grumman was aware that the Navy in accepting design data neither checks nor assumes responsibility for accuracy, completeness of detail or any deviation from applicable specifications, unless specifically approved by BUAIR.

38. Both Grumman and the Navy tested and evaluated A–6 prototypes; however, the Navy's testing and evaluation was largely quantitative and concerned whether or not the aircraft met its mission and performance criteria.

39. Grumman had final control of the actual design of the aircraft including its longitudinal flight control system.

40. Grumman decided what type of system to use and what the elements of it should be.

41. The A–6 aircraft produced by Grumman, including the subject aircraft, were defective when they were delivered to the Navy.

42. Grumman impliedly warranted the A–6 aircraft to be airworthy, of merchantable quality, fit and safe for the purposes for which it was intended, and free from all defects.

43. Gary Shaw, as a Navy pilot assigned to the A–6, relied on these warranties.

44. Grumman breached these warranties by designing, manufacturing, assembling, and selling the subject aircraft in a defective and unreasonable condition.

45. The ultimate defect in the longitudinal control system was its total lack of redundancy or compensating provisions so that any single point failure could cause random migration of the stabilator inevitably resulting in catastrophe.

46. Should the disconnect occur in the A–6 aft of the feel bungee, a loss of control is impossible for a pilot to detect.

47. The A–6, as designed by Grumman, had no warning device to alert the crew that a disconnect had occurred. In a take-off—low altitude situation like the subject accident, this forestalls any opportunity on the part of the crew to attempt to eject.

48. Although aware of an inherent defect in the system, Grumman negligently proposed correction of the disconnect problem by the installation of the self-retaining bolts, leading the Navy to believe the defect in the design had been cured.

49. Good design requires consideration of possible failures and maintenance capabilities.

50. Grumman was aware of the lack of redundancy in the system and the lack of warning to the crew in case of loss of control due to a disconnect aft of the feel bungee in the longitudinal flight control system.

51. The design defect and Grumman's negligence with regard to it was a proximate cause of the subject accident and Gray Shaw's death.

52. Redundancy is a basic element of design. There is nothing unique, new or mysterious about designing a longitudinal flight control system so that loss of control of the horizontal stabilizer will not occur. In fact, redundancy in primary flight control systems has been customary in aviation for over 40 years. As a design requirement it is a must.

53. General aviation aircraft and commercial transport aircraft all have redundancy in longitudinal flight control systems.

54. The A–6 aircraft has other flight control systems with alternative control functions to provide redundancy. Examples of such redundancies are on the wing flap system which incorporates a symmetry sensor and in the speed breaks. Such redundancies are common in other aircraft.

55. Grumman viewed the problem as one caused by shoddy Navy maintenance instead of recognizing and addressing the inherent defect in the design which, regardless of the cause of a disconnect, would likely result in catastrophe should a disconnect occur.

56. Grumman could have employed any of several alternative means to provide re-

dundancy. Dual controls, while only one such available alternative measure, could have been put in this aircraft, albeit with a weight penalty and increased complexity.

57. Even though the inherent parts of the longitudinal flight control system are so strong that they in themselves provide a form of redundancy, this does not alleviate the need for redundancy in the case of disruption of the system.

58. The "detail specifications" which the Navy provided Grumman are actually quite broad, leaving to the manufacturer the actual design choices and particulars.

59. MIL–F–18372 (Plaintiff's exhibit 7) covers the general requirements for design, installation and test of flight control systems for all types of Navy aircraft and lists a number of different ways a contractor can design a flight control system.

60. The A–6 aircraft failed to meet the Navy's specifications in several respects.

61. Pursuant to military specifications, Grumman was required to perform a failure effects analysis of the longitudinal flight control system of the A–6.

62. Grumman's failure effects analysis of the A2F–1 (Report No. RC–F–128–1.0) recognized the lack of compensating provisions or redundancy and classified failure of any summing linkage component as a Class I failure, i.e., "any single failure which is potentially fatal and would probably result in loss of the airplane or necessitate a forced landing".

63. Grumman performed no failure effects analysis on the A–6A at the time it modified the aircraft despite the fact that Navy specifications require that one be done and despite the fact that the longitudinal flight control system was substantially altered from a stabilizer having a geared elevator to a single slab stabilator. Changes were also made to the bell cranks and push rods.

64. The flight control system of the A–6 does not meet the Detail Specification for the Model A–6A (A2F–1) Airplane (Plaintiff's exhibit 9A), paragraph 1.1.2a regarding those essential features of simplicity,

reliability, ease of maintenance and compensating provisions for failure, nor does it meet MIL–F–18372 (AER), paragraph 3.1.-1.1, requiring a flight control system to be as simple, direct and foolproof as possible with respect to design, operation, inspection and maintenance.

65. The flight control system of the A–6 does not comply with MIL Spec. 18372, paragraph 3.1.1.24, which requires designing of certain devices so that their failure will not cause discontinuity of the system.

66. The flight control system of the A–6 did not meet the criterion as was revealed in its failure effects analysis.

67. Paragraph 3.2.15 of SD–24K (Plaintiff's exhibit 9–T), also mentions redundancy and failsafe requirements.

68. This failsafe revision of the Navy specifications called for and required a redundancy factor in the nature of a backup system. Grumman failed to design a redundant system.

69. It would have been possible to have designed a longitudinal flight control system for the A–6 which incorporated redundancy.

70. Installation of a locking device to prevent random migration of the stabilator is within the realm of feasibility. In fact, there are such locking devices on other control systems of the A–6.

71. The particular longitudinal flight control system employed by Grumman in the A–6 is neither uniquely military nor on the cutting edge of military design. This type of control system using bell cranks and push rods has been around general aviation a long time.

72. There was an imbalance of knowledge between Grumman and the Navy regarding the risks involved in Grumman's design of the longitudinal flight control system.

73. At all times material, Grumman was aware of the lack of redundancy in the longitudinal flight control system so that any single point failure would cause ran-

dom migration of the stabilator inevitably resulting in catastrophe.

74. Grumman considered the random migration of the stabilator in the case of a disconnect, but gave no consideration to a safety mechanism to prevent it.

75. Grumman failed to discuss the ultimate defects in the longitudinal flight control system of the A–6 with the Navy and focused instead on the superficial problem of bolt failures.

76. Once aware of the defect due to the history of accidents with the aircraft, the Navy issued AFC 416 justifiably relying on Grumman's advice that the problem with the longitudinal flight control system would be solved by installation of the self-retaining bolts.

77. While the lack of redundancy may or should have been made apparent to the Navy, it had neither the design staff nor the expertise to comprehend the catastrophic potential and probability of the disconnect problem.

78. Grumman's knowledge, expertise in and awareness of design defects were superior to that of the Navy.

79. Grumman failed to warn the Navy about the ultimate and underlying defect in the longitudinal flight control system of the A–6.

80. The Navy was not aware of the defect in design at the time it approved the detailed specifications submitted by Grumman.

81. Grumman failed to adequately warn the Navy or ultimate users of the aircraft like Gary Shaw of the inherent danger in the longitudinal flight control system of the aircraft.

Any of the foregoing findings of fact which may constitute conclusions of law are hereby adopted as conclusions of law.

### Conclusions of Law

82. This Court has jurisdiction pursuant to the provisions of the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.* and Federal Admiralty Law, 28 U.S.C. § 1333. Venue is proper.

83. Given the Navy's determination as to the capabilities the A–6 should have, as embodied in the performance specifications it submitted to Grumman, the A–6 aircraft was not fit for its intended use.

84. It was Grumman who supplied the actual detailed designs and who had final control over the aircraft. *See Schoenborn v. Boeing Company,* 586 F.Supp. 711 (E.D. Pa.1984).

85. Given the Navy's specifications regarding the essential features of simplicity, reliability, ease of maintenance and compensating provisions for failure pursuant to Detail Specifications (Plaintiff's exhibit 9A), paragraph 1.1.2a, and those in MIL–F–18372 (AER), paragraph 3.1.1.1. requiring a flight control system to be as simple, direct and foolproof as possible with respect to design, operation, inspection and maintenance, the A–6A, as designed by Grumman, failed to meet the government's general specifications in all material respects. Furthermore, its own failure analysis revealed the defect to the Grumman.

86. Grumman was negligent in its design, manufacture, and testing of the A–6 aircraft and in particular its longitudinal flight control system.

87. Grumman's negligent design of the subject aircraft proximately caused the death of Gary Shaw, a foreseeable user to whom Grumman owed a duty of care.

88. Grumman's design of the subject aircraft constituted a breach of warranties of merchantability, fitness, and freedom from defects so as to proximately cause the death of Gary Shaw, one entitled to rely upon such warranties.

89. Grumman is strictly liable to the Plaintiff for damages for the death of Gary Shaw. *See Schoenborn v. Boeing Company, supra; see also, Jenkins v. Whittaker Corp.,* 551 F.Supp. 110 (D.Hawaii 1982).

90. Defendant asserts the *Feres—Stencel* government contractor defense.

*See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). The burden of proof regarding the availability of the government contractor defense rests with Grumman. *See McKay v. Rockwell International Corp.,* 704 F.2d 444, 451 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *In Re Agent Orange Product Liability Litigation,* 534 F.Supp. 1046, 1055 (E.D.N. Y.1982); and *Hubbs v. United Technologies,* 574 F.Supp. 96, 98 (E.D.Pa.1983). It must be proved by a preponderance of the evidence. *McKay* at 453.

■ 91. Grumman has failed to meet its burden of proof in regard to application of the government contractor defense. The evidence is insufficient to show that: 1) the Navy and not Grumman established the actual detail specifications and drawings of the longitudinal flight control system of the aircraft; 2) Grumman met the government specifications in all material respects in design of the A–6 aircraft; 3) Grumman warned the Navy about patent errors in the specifications or about dangers involved in the use of the aircraft that were known to Grumman but not to the Navy. *See McKay v. Rockwell International Corp., supra; In Re Agent Orange Liability Litigation, supra; Koutsoubos v. Boeing Vertol, Division of Boeing Co.,* 553 F.Supp. 340 (E.D.Pa.1982); and *Hubbs v. United Technologies, supra.* Furthermore, there was an imbalance of knowledge about the defect between the supplier and the military at the time Grumman's detail specifications were approved. Once aware of the design defects, the Navy was lead by Grumman to believe that the installation of the self-retaining bolts would correct the problem. The Navy was justified in relying on Grumman's design expertise and experience when it represented that the new bolt would correct the problems caused by the defect.

■ 92. Because the design decisions material to the defect alleged required no military expertise, there is no justification

for insulating a contractor from liability where the government merely approves of the decision.

93. In any case, mere Navy approval of the detail design specification and drawings developed by Grumman does not make the government contractor defense available to it. "Where a contractor establishes a product's detailed specifications and the government merely approves them, the government contractor defense is not available to the contractor." *Schoenborn v. The Boeing Co., supra.*

94. The parties have stipulated that the total damages recoverable by the Plaintiff, in the event liability is found for Plaintiff, is the sum of $840,556.75, with the exception of certain deductions (VA benefits) and/or additions (pre-judgment interest). The parties have submitted memoranda of law, each respectively, covering both the VA benefits deductions issue and the pre-judgment interest issue. Accordingly, having reviewed these memoranda of law and being otherwise fully advised in the premises, this Court concludes as to those two issues as follows:

■ A. The award of pre-judgment interest in death claims under DOHSA is discretionary with the trial Court. Pre-judgment interest may not be awarded in the case *sub judice* because: (1) Plaintiff waited almost two years after the death of Gary Scott Shaw before he instituted the instant suit; (2) there is a genuine dispute regarding liability in the case *sub judice* which was exacerbated by the fact that the wreckage of the aircraft has never been retrieved; and (3) this action involves complex factual and legal issues, including those pertaining to the applicability of the government contract defense. *Solomon v. Warren,* 540 F.2d 777 (5th Cir.1976); *First National Bank of Chicago v. Material Service Corporation,* 597 F.2d 1110 (7th Cir.1979); *Sinclair v. S.S. Green Island,* 426 F.2d 260 (5th Cir.1970).

■ B. The parties agree that the widow and children of the deceased pilot have received and are receiving Veterans Bene-

fits under the Veterans Benefits Act. Defendant argues that any damages awarded by the trial court should be reduced by the compensation received by Plaintiff under the Veterans Benefits laws. In support of this position, Defendant cites *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949); *Kubrick v. United States*, 581 F.2d 1092 (3d Cir.1978); *rev'd on other grounds*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979); *Pike v. United States*, 652 F.2d 31 (9th Cir.1981); *United States v. Brown*, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954). These cases afford no comfort to Defendant because they simply hold that in an action against the United States under the Federal Tort Claims Act, such Veterans Benefits may be set-off as against a verdict adverse to the United States. Here the Defendant is not being asked to pay twice for the same injuries. Instead, the wrongdoing Defendant is being assessed is for the wrong it afflicted on the Plaintiff and should not be reduced by reason of a third-party payment from the United States. *McKay v. Rockwell*, 704 F.2d 444 (9th Cir.1983), does not constitute authority to support Defendant's right to a set-off. The Ninth Circuit reversed the District Court's finding of liability and did not address the trial court's discussion of damages.

Plaintiff's position is bolstered by the fact that there is no duplicity of compensation because the payments come from different sources, *see United States v. Harue Hayashi*, 282 F.2d 599, 604 (9th Cir.1960), and the "collateral source" rule, as applied under Florida law, prohibits any set-off. *See* 17 Fla.Jur.2d § 39; *Freeman v. Rubin*, 318 So.2d 540, 544 (Fla. 3d DCA 1975); *Felder v. United States*, 543 F.2d 657, 670 (9th Cir.1976); *Huddell v. Levin*, 395 F.Supp. 64, 88 (D.N.J.1975). This is not like the Federal Tort Claims Act cases where the wrongdoer is also the provider of the benefits. It is only fair that Grumman be made accountable for its transgressions.

95. Thereupon Final Judgment will be entered in favor of the Plaintiff and against the Defendant in the sum of $840,-556.75, together with Plaintiff's costs to be taxed by the Clerk of this Court upon a Bill of Costs to be submitted by Plaintiff within THIRTY (30) DAYS herefrom.