769 F.2d 115
 54 USLW 2051, Prod.Liab.Rep.(CCH)P 10,598
 In re AIR CRASH DISASTER AT MANNHEIM GERMANY ON 9/11/82.
Ursula J. SCHOENBORN, as Executrix of the Estate of Leon
Edward Schoenborn, Deceased,
v.
The BOEING COMPANY.
Appeal of The BOEING COMPANY.
 No. 84-1446.
 United States Court of Appeals,
Third Circuit.
 Argued March 21, 1985.
Decided June 28, 1985.
As Amended July 15, 1985.
Rehearing Denied July 25, 1985.
 
 F. Hastings Griffin, Jr. (Argued), E. David Chanin, Dechert Price & Rhoads, Philadelphia, Pa., Steven S. Bell, Barry J. Reingold and Perkins Coie, Seattle, Wash., for appellant.
 Mark Alan Corchin, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for appellee Ursula J. Schoenborn, et al.
 Philip Silverman, Juanita M. Maadole, Speiser, Krause & Madole, Washington, D.C., for appellee Birgit Brock, et al.
 James J. McCarthy (Argued), Magana, Cathcart, McCarthy & Pierry, Los Angeles, Cal., Joseph H. Reiter, Stassen, Kostos & Mason, Philadelphia, Pa., for appellee.
 Before HUNTER and GARTH, Circuit Judges, and GERRY, District Judge*.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 This appeal requires us once again to explore the parameters of the government contractor defense in product liability actions involving an alleged design defect. See Koutsoubos v. Boeing Vertol, 755 F.2d 352 (3d Cir.1985); Brown v. Caterpillar Tractor Co., 741 F.2d 656 (3d Cir.1984).
 
 
 2
 Plaintiffs in this action are the survivors and personal representatives of servicemen who died in the crash of a Boeing-Vertol helicopter near Mannheim, West Germany, on September 11, 1982. In answering special interrogatories, a jury found Boeing liable to the plaintiffs. Because we find that the government contractor defense applies to this claim and that the district court erred in submitting the case to the jury, we reverse and remand the case for entry of judgment notwithstanding the verdict in favor of Boeing-Vertol.
 
 I.
 
 3
 On September 11, 1982, a helicopter crashed near Mannheim, West Germany. The helicopter, a U.S. Army CH-47C "Chinook" (No. 22292), was manufactured and assembled in Pennsylvania by Boeing-Vertol, a division of Boeing. As a result of the accident, all forty-six crew members and passengers on board were killed.
 
 
 4
 On the date that the accident occurred. Helicopter 22292 was carrying a number of British, French, and German parachutists who planned to jump when the helicopter reached an altitude of 12,000 feet. At approximately 10,500 feet, the helicopter began to descend and notified ground control that it was returning for landing. The helicopter's pilot stated that he had heard a noise from the rear of the craft and that a flicker had been observed on the master caution panel. At between 800 and 1,000 feet, pieces of the helicopter then began to fall, including the aft (rear) rotor blades, followed by the aft transmission. The helicopter then turned 180 degrees, lost airspeed and fell vertically. It exploded and burned on impact.
 
 
 5
 An understanding of the mechanics of the helicopter transmission is essential to an understanding of the issues raised in this case. Helicopter 22292 was a tandem-rotor helicopter on which the paths of the forward and aft rotor blades intersected. To ensure proper flight, all components of the drive system that transmitted power to the forward and aft rotor blades had to be synchronized.
 
 
 6
 Power from engines in the rear of the aircraft was transmitted to the forward and aft transmissions through a drive train consisting of aluminum shafts linked to each other by flexible couplings suspended within a protective tunnel along the top of the helicopter airframe. These shafts, which linked together, formed the synchronizing or "sync" shaft which rotated at a constant speed. The design clearance between the sync shaft and the tunnel floor was 0.5 inches, plus or minus normal manufacturing tolerances. This clearance was uniform throughout the tunnel, including at Station 120, the point at which the sync shaft fractured due to contact and friction.
 
 
 7
 The forward-most section of the sync shaft was connected to the pinion shaft. The pinion shaft, a thick steel cylinder with a gear on the forward end, meshed with the main transmission gears that drive the forward rotor blades. The pinion shaft was held in place within the transmission by three sets of steel bearings which, in normal operation, permitted the pinion to move no more than .0081 of a degree from dead center. The pinion bearings required adequate lubrication to function properly.
 
 
 8
 Post-accident investigation suggested the following sequence of events: (1) the pinion assembly of the forward transmission failed due to insufficient lubrication because of clogged oil jets; (2) the forward synchronizing driveshaft was severed by contact with an airframe bulkhead; and (3) the forward rotor blades struck and severed the aft rotor blades.
 
 
 9
 Helicopter 22292 was built by Boeing under a 1974 government contract. Helicopters of the Chinook type were first developed by Boeing and the Army in the 1960's. Boeing developed the CH-47 design in response to Army mission and performance requirements. The Army approved the design, inspected prototypes, implemented design changes, then approved the design for production in the early 1960s. In 1966, two prior accidents involving Chinook helicopters (Nos. B-67 and B-75) were investigated by both the Army and Boeing. In each instance, Boeing concluded that lubrication starvation caused bearing failures which, in turn, caused the pinion shaft to be displaced. This displacement resulted in the ultimate failure of the synchronizing shaft. As a consequence of these investigations, Boeing suggested multiple design changes in the forward transmission system.[1] The Army approved certain changes, but rejected a proposed change which would have provided a separate oil line leading to the pinion bearings and equipped with a fine mesh screen to filter out particles (Engineering Change Proposal (ECP) 422) (see note 1C below).
 
 
 10
 As a result of the Mannheim crash, numerous actions were brought against Boeing by foreign and American personal representatives and next-of-kin.[2] The asserted theories of liability included breach of warranty, negligence, and strict liability under section 402A of the Restatement (Second) of Torts. By order of October 25, 1983, the District Court for the Eastern District of Pennsylvania consolidated all cases for purposes of trial on the issue of liability. In Re Air Crash Disaster at Mannheim, Germany, 575 F.Supp. 521 (E.D.Pa.1983). The court further decided that Pennsylvania law would control all issues of liability in all cases and that, with respect to the foreign plaintiffs' damage claims, Pennsylvania law would also govern. 575 F.Supp. at 527.
 
 
 11
 Trial was bifurcated with the issues of liability and damages to be tried separately. A jury trial was held on the issue of liability. Plaintiffs called several experts to testify about helicopter design and specifically about the aspects of the CH-47C design that contributed to the crash. Much of this testimony focussed on the rupture of the sync shaft at station 120, a rupture which, by agreement of all of the experts, occurred after the failure of the forward transmission had permitted displacement of the pinion gear. This displacement in turn allowed the sync shaft to rub against the aircraft's structure, weakening the sync shaft and, according to plaintiff's experts, causing the shaft's rupture when power was applied to the transmission. Plaintiff's expert, Angelo A. Coronato testified to four specific defects in the transmission design.[3] Three of these defects related to the transmission itself, while one defect focussed on the construction of the sync shaft.
 
 
 12
 Plaintiffs also presented some evidence that Boeing was aware that the sync shaft had failed due to rubbing at station 120 in the prior crashes of the CH-47C design. Plaintiffs charged that Boeing failed to inform the Army of its conclusions that sync shaft failure was implicated in the crash or suggest any modification of the sync shaft design.
 
 
 13
 Boeing asserted four specific defenses to the plaintiffs' claims that the helicopter was negligently designed and defective: (1) that the government contractor defense shielded Boeing from liability; (2) that ECP 422, rejected by the Army, would have prevented the Mannheim accident;[4] (3) that the Army, by its cleaning process which included sand-blasting the transmission with walnut shells, improperly maintained the helicopter;[5] and (4) that the Army thereby substantially changed the product's condition. Boeing's motion for a directed verdict was denied. The following special interrogatories were submitted to the jury:
 
 
 14
 1. Was the defendant Boeing-Vertol negligent?
 
 
 15
 2. Was the negligence of Boeing-Vertol a proximate cause of the accident?
 
 
 16
 3. Was the Government's maintenance a superseding cause of the accident?
 
 
 17
 4. Did the defendant Boeing-Vertol have final control of the design of the aircraft?
 
 
 18
 5. Was the aircraft when delivered by defendant to the Army defective?
 
 
 19
 6. Was the defect a proximate cause of the accident?
 
 
 20
 The jury, answered each interrogatory in favor of the plaintiffs. Questions 1, 2, 4, 5, and 6 were answered "yes", question 3 was answered "no". The jury was not given an interrogatory which required an answer as to whether the Army had approved the specifications.
 
 
 21
 The district court denied Boeing's motion for judgment notwithstanding the verdict and for a new trial, specifically holding that the government contractor defense was inapplicable since Boeing initially developed the helicopter design based on the Army's designation of performance specifications, despite the fact that the Army subsequently approved those specifications. 586 F.Supp. 711.
 
 
 22
 The district court certified the applicability of the government contractor defense as a controlling question of law appropriate for immediate review under 28 U.S.C. Sec. 1292(b). This Court accepted a petition for interlocutory review.[6]
 
 II.
 
 23
 This appeal requires us to determine, under Pennsylvania law,[7] the extent to which a contractor's participation in developing a design subsequently approved by the Army bars the contractor's assertion of the government contractor defense. In Brown v. Caterpillar Tractor Co. (Brown II), 741 F.2d 656 (3d Cir.1984) and Brown v. Caterpillar Tractor Co. (Brown I), 696 F.2d 246 (3d Cir.1982), we held that the government contractor defense was available under Pennsylvania law as a defense to strict products liability actions.[8] As we stated in Brown II,
 
 
 24
 [T]he issue in a design defect case is whether the design of the product is or is not that called for by the specification.
 
 
 25
 741 F.2d 662. Brown I specifically rejected compulsion to comply with specifications by the government, as an element of the defense. Nonetheless, we left open the possibility that a different result might obtain where
 
 
 26
 the specifications are skeletal, the contract is negotiated, and the contractor, knowing of a high risk of serious harm, fails to install a relatively inexpensive safety device.
 
 
 27
 696 F.2d 254 n. 17.
 
 
 28
 The Brown cases did not address the issue, however, of the amount of contractor participation in the design permissible before the government contractor defense is lost. This court spoke to that issue as a question of federal law in Koutsoubos v. Boeing Vertol, 755 F.2d 352 (3d Cir.1985). In Koutsoubos, a Navy crewman was killed when a Boeing-Vertol helicopter flipped over in the water. The crewman's administrator sued under admiralty jurisdiction. We affirmed the district court's grant of partial summary judgment in favor of Boeing on the government contractor defense despite affidavits that Boeing had originated many of the specifications for the helicopter.
 
 
 29
 In Koutsoubos, we recognized that in tort actions against military contractors, the government contractor defense derives from the doctrine of federal immunity established by Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). We also recognized the holding of the Feres and Stencel cases--that the Federal Torts Claim Act does not waive the government's sovereign immunity against actions by military personnel for service-related injuries--would be subverted if military contractors could be held liable to military personnel, since the contractors could pass the cost of that liability along to the government. Koutsoubos, 755 F.2d at 354.
 
 
 30
 Koutsoubos, however, also acknowledged that the foundation of the Feres-Stencel doctrine is the constitutional precept of separation of powers:
 
 
 31
 [H]olding military contractors liable [for design defects] would "thrust the judiciary into the making of military decisions. Although judges must decide cases arising from fields of endeavor of which they know little, their otherwise omnicompetence confronts its limits in military matters. At this point, it must be acknowledged, separation of powers becomes a proper concern."
 
 
 32
 Id. at 354 (quoting McKay v. Rockwell International Corp., 704 F.2d 444, 449 (9th Cir.1983)). See also Stencel, 431 U.S. at 673, 97 S.Ct. at 2059 (trial of serviceman's personal injury action against United States and military contractor would necessitate judicial second-guessing [of] military orders. This factor ... weighs against permitting any recovery....").
 
 
 33
 The separation of powers principle that bars judicial second-guessing of military judgments applies, regardless of the status of the plaintiffs, wherever recovery is sought for an alleged defect in a product designed for military use, as the Chinook helicopter in this case indisputably was. Clearly, however, where recovery is sought against a military contractor, no separation of powers concern arises unless the design in question represents a judgment by the military. Hence, government establishment or approval of the specifications in question is a significant element of the military contractor defense. Koutsoubos, 755 F.2d at 355.
 
 
 34
 In Koutsoubos, therefore, we adopted the three part test for the government contract defense in military equipment cases developed by Judge Pratt in In re "Agent Orange" Product Liability Litigation, 534 F.Supp. 1046 (E.D.N.Y.1982). This test requires for a valid defense that: 1) the government establish the specifications for the product; 2) that the manufacturer complied with these specifications; and 3) that the government knew as much as or more than the contractor about the hazards of the product as designed. 534 F.Supp. at 1055. The threshold issue here, as with the helicopter design in Koutsoubos, is whether the Army "established" the specifications for the CH-47C even though Boeing participated in the design of the aircraft.
 
 
 35
 In Koutsoubos, we decided that government approval of specifications developed through a continuous series of negotiations between the contractor and the military satisfied the first prong of the Agent Orange defense, even though the majority of specifications originated with the contractor. We thus accepted the Ninth Circuit's conclusion in McKay v. Rockwell International Corp., 704 F.2d 444 (9th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), that a military contractor, confronted with section 402A liability, might meet the first element of the defense where the government reviewed and approved a detailed set of specifications.[9] Thus, under Koutsoubos, the government contractor defense is available to a contractor that participates in the design of the product, so long as the government's approval consists of more than a mere rubber stamp. The defense is available so long as there is true government participation in the design.
 
 
 36
 Both McKay and Koutsoubos, however, were decided under federal law as cases within the admiralty jurisdiction. That the instant case involves Pennsylvania law does not alter the underlying rationales for recognizing the sufficiency of government approval. Adoption of the Agent Orange criteria, as interpreted by McKay and Koutsoubos, does not conflict with the government contractor defense as it currently exists under Pennsylvania law.
 
 
 37
 In Koutsoubos, as we have previously observed, we recognized several public policy justifications for the Agent Orange formulation of the government contractor defense in military product cases, including 1) the preservation of governmental immunity under Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); 2) the inability of the judiciary to review military decisions; 3) the bargaining position of contractors; and, 4) encouraging participation by contractors in product design. The first of these justifications was recognized by the Pennsylvania Supreme Court in Valley Forge Gardens, Inc. v. James D. Morrissey, Inc., 385 Pa. 477, 483-84, 123 A.2d 888, 891 (1956). In Brown I, we predicted that Pennsylvania was likely to adopt the other justifications for the defense. 696 F.2d at 250-51 n. 9, 252 n. 12. Further, the third prong of the Agent Orange test, requiring equal or greater knowledge of hazards by the government, encourages contractors to warn the government of known hazards of the product, and limits the availability of the defense where the contractor fails to warn the government.
 
 
 38
 We thus hold that under Pennsylvania law, the government contractor defense is available despite the contractor's participation in development of the design, so long as the government has approved the design after a substantial review of the specifications.
 
 III.
 
 39
 Having established the parameters of the government contractor defense, we now must determine whether this issue was appropriately submitted to the jury on the evidence presented at trial. Our review of the denial of entry of judgment notwithstanding the verdict is highly circumscribed; we may direct entry of judgment notwithstanding the verdict only where, upon review of all of the evidence and drawing all inferences in favor of the verdict winner, judgment for the verdict loser is demanded as a matter of law. See Neville Chemical Company v. Union Carbide Corporation, 422 F.2d 1205, 1211-12 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). In our review of the record, we have determined that this is a case in which a grant of judgment n.o.v. is required.
 
 
 40
 Of the three elements of the government contractor defense, only the first, requiring government approval of the specifications, and the third, requiring government knowledge of the product's hazards, are here in issue. Plaintiffs do not claim that the second element, compliance with specifications, is not met.
 
 A.
 
 41
 With respect to government approval of the specifications, the evidence is undisputed that helicopter 22292 was produced under contract number DAAAJO1-74-C-0892, issued June 28, 1974. This contract required that the helicopter be constructed in accordance with the very details of the transmission and sync shaft designs which are claimed to be defective by plaintiffs. Indeed, the specifications incorporated by reference into the contract, call for the lubrication configuration of the transmission, for the type of chip detector used, and for the use of aluminum tubing in the sync shaft. Detail drawings of the aircraft also mandated the amount of sync shaft clearance in the sync shaft tunnel of the aircraft. Boeing was not permitted to deviate from these specifications without Army approval. Specifically, the contract provided that:
 
 
 42
 Section J.22 Engineering Change Proposal Procedure
 
 
 43
 * * *
 
 
 44
 * * *
 
 
 45
 b. The official base line configuration is that configuration established by the delivery of CH-47 type Aircraft Serial Number 64-13107 (B-79) as modified by the minutes of the First Article Configuration Inspection of 14 and 15 January 1965, and as further modified by all Engineering Changes approved by the Government. For the purpose of this contract the configuration of the aircraft to be delivered hereunder is defined in Section "E", Item Number 0001, of this contract and as modified by approved Engineering Change Proposals.
 
 
 46
 c. The aforementioned configuration base line shall not be revised until an Engineering Change Proposal has been submitted by the Contractor and approved by the Government.
 
 
 47
 (Emphasis added).
 
 
 48
 Not only does this contract clause establish the design of the CH-47C helicopter, including the design defects upon which the plaintiffs' case relies, but it also recites that the Army had inspected and modified the prototype aircraft. This clause alone is sufficient to satisfy the level of governmental participation in design so as to constitute "approval" under the Koutsoubos test discussed above. In addition, the undisputed testimony of one Boeing engineer was that the Army performed rigorous tests on the prototype aircraft. He testified that the Army had disassembled and reassembled the aircraft and tested the aircraft extensively in flight under severe conditions. According to this uncontradicted testimony, the Army then required certain design changes before the aircraft went into production. These changes were incorporated into helicopter 22292's design by Army direction.[10]
 
 
 49
 We have reviewed this evidence even though we are aware that the district court held that the government had approved the very design at issue. 586 F.Supp. at 716. Indeed, it would have been difficult, if not impossible, for the district court to have held otherwise since the contract in this case, which was drafted by the government, expressly incorporates by reference the detailed specifications that Boeing had provided.[11]
 
 
 50
 The contract provisions by themselves would be sufficient without more, to support a holding as a matter of law that the government approved the design at issue.[12] When we add to the contract provisions, which include the contract's approval procedure for engineering change proposals,[13] and the evidence cataloged above, it is evident that the Army retained final authority over the design of the helicopter and that therefore the government "approval" prong of the Koutsoubos test has been met.[14]
 
 B.
 
 51
 The other element of the defense disputed by the parties has to do with the doctrine's requirement that the government have a knowledge of the product's hazards equal to, or greater than, the knowledge of the contractor. Here again, the evidence is undisputed that the Army was aware of two 1966 crashes of CH-47 helicopters resulting from forward transmission failure. Despite this knowledge the Army refused to implement a Boeing proposed modification of the transmission lubrication system which Boeing proposed in order to prevent bearing failures.
 
 
 52
 Plaintiffs contend that Boeing failed to share with the Army its knowledge that transmission failure would cause the sync shaft to rub at section 120, the point of minimum clearance. The plaintiffs point to a Boeing memorandum analyzing a helicopter incident that occurred in Viet Nam. The memorandum concluded that
 
 
 53
 when the pinion bends two degrees, the synch shaft rubs hard on structure. This rub (hard) precipitates the immediate and ultimate failure.
 
 
 54
 Plaintiffs claim that there is no evidence that the Army had knowledge of this memorandum or its analysis of the consequences of transmission failure.
 
 
 55
 We are satisfied that the issue of the Army's knowledge of the sync shaft's tendency to fail as a result of transmission failure is irrelevant to the government contractor defense in this case. It is undisputed that the Army had knowledge that the forward transmissions in use on the CH-47C had a dangerous propensity towards bearing failure, yet the Army adhered to the original design specifications. The expert testimony presented by plaintiffs bore out the fact that the rubbing of the synchronization shaft would occur only after a "massive" failure of the transmission bearing (testimony of Joseph C. Paschal, appendix at 904). It is clear from the uncontradicted testimony concerning prior CH-47 accidents which resulted from faulty transmissions, that the Army knew that the forward transmission was hazardous and that failure of the transmission would precipitate the crash of the helicopter. Yet, it is undisputed that prior to the execution of the 1974 contract under which helicopter 22292 was built, the Army had rejected proposed design modifications aimed at preventing such a transmission failure.
 
 
 56
 We conclude that the relevant knowledge which the Army must possess in order to satisfy the third prong of the Koutsoubos test is knowledge of a defect in an essential or key component of the mechanism (here, a helicopter transmission system): a defect which if uncorrected may result in the disabling of the aircraft. In this case, the record, as we have previously stated, is clear that the Army knew of the transmission's tendency to fail without warning due to lubrication starvation resulting from failure to screen the oil line. Indeed, as we have discussed earlier, for reasons not disclosed, the Army had specifically rejected the very modification proposed by Boeing which would have corrected this condition.
 
 
 57
 Moreover, it is undisputed that the sync shaft could fail only after transmission failure, and the record unqualifiedly discloses that the Army had as much knowledge of the transmission problems as did Boeing.
 
 IV.
 
 58
 The plaintiffs' argument centered on the two main issues we have discussed. The plaintiffs contended that the Army approval of the helicopter specifications was insufficient to invoke the government contractor defense and that the Army did not know of the defect which caused the helicopter crash. We have addressed both issues in terms of the government contractor defense, and because it is undisputed that the Army approved the contract and knew of the transmission defect, it is apparent that the government contractor defense shielded Boeing. Because the record which we have reviewed on this appeal not only establishes the Army's knowledge of the transmission defect, but also establishes that the specifications for the CH-47C Chinook represent a military judgment and were approved by the Army, no disputed issue of fact remained for jury consideration. This being so, the district court should have rendered judgment for Boeing as a matter of law.
 
 
 59
 Since Boeing-Vertol has established all the elements of the government contractor defense by undisputed evidence, we reverse and direct the district court to enter judgment n.o.v. in favor of Boeing-Vertol. Given this disposition, we need not reach Boeing's other claims of error by the district court.
 
 
 60
 Accordingly, the order of the district court dated May 14, 1984 will be reversed, with the direction that the district court enter judgment in favor of Boeing-Vertol.
 
 SUR PETITION FOR REHEARING
 
 61
 Before ALDISERT, Chief Judge, SEITZ, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges, and GERRY, District Judge.*
 
 
 62
 The petition for rehearing filed by appellants, Ursula J. Schoenborn, as Executrix of the Estate of Leon Edward Schoenborn, deceased, in the above-entitled case having been submitted to the judges who participated in the decision of this court, and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 63
 GIBBONS, Circuit Judge, would grant the petition for rehearing.
 
 
 
 *
 Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation
 
 
 [1]
 The following changes were proposed:
 A. Place indicating buttons on forward and aft filters. Engineering Change Proposals (ECP) 418, 419.
 B. Install redundant oil jets--three at each bearing. ECP 420, 421.
 C. Install a screen in the lubrication line before oil reaches jets. ECP 422.
 D. Improve oil drainage at pinion bearings. ECP 442.
 E. Incorporate improved chip detector (to detect metal flakes in lubricant which result from metal breakdown). ECP 153.
 F. Incorporate lock nut positive retention at overhaul. ECP 296, 295, 297.
 G. Provide close tolerance nuts for high speed drive shaft applications. ECP 505.
 
 
 [2]
 Over forty separate actions were filed in the Eastern District of Pennsylvania. Two additional actions, brought by surviving relatives of German decedents, were filed in the Northern District of California. Subject matter jurisdiction was founded on diversity of citizenship in each instance. By order of the panel on Multidistrict Litigation, the two California cases were transferred to Pennsylvania, pursuant to 28 U.S.C. Sec. 1407
 
 
 [3]
 Coronato testified to the following defects:
 
 
 [1]
 The lack of an adequate chip detector sufficiently sensitive to give the pilot warning of a bearing failure
 
 
 [2]
 The lack of a thermal probe in the transmission to give the pilot warning of a bearing failure
 
 
 [3]
 Failure to fabricate ball bearing retainers of steel rather than bronze, since steel chips are more easily detected
 
 
 [4]
 Failure to construct the sync shaft of more abrasion resistant steel rather than aluminum
 
 
 [4]
 See Note 1. ECP 422 would have provided a screen in the oil line to screen out the sort of impurities which clogged the oil jets
 
 
 [5]
 The walnut shell residues, which were not screened, apparently clogged the oil jets which lubricated the bearings in the transmission
 
 
 [6]
 In addition to its motion for judgment notwithstanding the verdict, Boeing asserts several errors as grounds for a new trial. Specifically, Boeing complains that the special interrogatories and jury charge did not adequately put the government contractor defense to the jury; that the jury was improperly allowed to consider the sync shift clearance as a design defect; that the district court improperly communicated with a juror ex parte; that the district court should have discharged the jury after plaintiffs' counsel referred to a "hold harmless" agreement between Boeing and the Army; that the district court improperly excluded evidence that the Army subsequently rejected the specific design modifications proposed by plaintiffs' experts; and that the district court improperly admitted evidence of subsequent remedial measures and evidence of manufacturing defects in other CH-47 helicopters. Given our disposition of this case, we have no need to reach these issues
 
 
 [7]
 In Brown v. Caterpillar Tractor Co. (Brown I), 696 F.2d 246 (1982), we held that state, not federal law, governs the applicability of the government contractor defense. The law of Pennsylvania, as the place of the manufacture of the helicopter in question, is the appropriate law to apply to a products liability action, despite the fact that the accident occurred elsewhere, since Pennsylvania has the greatest interest in governing the liability of manufacturers within its state. See Broome v. Antlers' Hunting Club, 595 F.2d 921 (3d Cir.1979) (Pennsylvania applies governmental interest approach)
 
 
 [8]
 Plaintiffs assert that the government contractor defense is unavailable in a case of negligent design, as was found by the jury here. In Brown I, however, we held that the Pennsylvania government contractor defense does apply to negligent design cases as well as to strict liability cases. See 696 F.2d at 250 n. 8
 
 
 [9]
 In McKay, the Ninth Circuit found that the government contract defense was a logical outgrowth of the Feres-Stencel doctrine barring government liability either to servicemen injured on active duty or to third parties seeking indemnification for damages paid to military personnel injured during service. See Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (limiting liability to military personnel under Federal Tort Claims Act); Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977) (Federal Tort Claims Act precludes United States from indemnifying a third party for damages paid injured servicemen). Accordingly, the court articulated four specific requirements for successful assertion of the government contractor defense:
 To summarize, we hold that under the Feres-Stencel doctrine and the government contractor rule, a supplier of military equipment is not subject to section 402A liability for a design defect where: (1) the United States is immune from liability under Feres and Stencel; (2) the supplier proves that the United States established, or approved, reasonably precise specifications for the allegedly defective military equipment; (3) the equipment conformed to those specifications; and, (4) the supplier warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the supplier but not to the United States.
 904 F.2d at 451. The McKay court concluded that the record before it did not permit any determination whether the United States "set or approved reasonably-detailed specifications" for the products at issue. Id. at 453. The case was therefore remanded.
 
 
 [10]
 As recognized, military approval may be proved by a showing that the contract resulted from "continuous back-and-forth" between the contractor and the government, and that the government retained final decision-making authority. Koutsoubos, 755 F.2d at 355. Here, it is undisputed that the design for the CH-47C Chinook was the culmination of years of negotiations on earlier contracts for earlier models of the Chinook. As we have pointed out, it is also clear from the face of the contract that the Army retained final decision-making authority. Koutsoubos v. Boeing Vertol, 755 F.2d 352 (3d Cir.1985)
 
 
 [11]
 The contract provided that:
 All specifications, exhibits, tables and drawings which are referenced in this contract but are not attached hereto are hereby incorporated herein by reference.
 
 
 [12]
 In Pennsylvania, issues of contract interpretation are for the court and not the jury. Hewes v. McWilliams, 412 Pa. 270, 194 A.2d 339 (1963). See also Ram Construction Co. v. American States Insurance Co., 749 F.2d 1049 (3d Cir.1984)
 
 
 [13]
 See appendix at 136-42
 
 
 [14]
 The district court failed to frame an interrogatory with respect to government approval of specifications, despite a request by Boeing for such an interrogatory. Boeing, in its alternative argument for a new trial, focussed on this failure of the district court properly to put the government contractor defense to the jury. Because of our disposition of this case, we do not address this argument
 
 
 *
 Honorable John F. Gerry, United States District Judge for the District of New Jersey, sitting by designation