**Gloria TREVINO, et al.**

v.

**GENERAL DYNAMICS CORPORATION.**

Civ. A. No. B–83–573–CA.

United States District Court, E.D. Texas, Beaumont Division.

Feb. 3, 1986.

Wayne Fisher, Charles M. Price and Michael J. Maloney, Fisher, Gallagher, Perrin & Lewis, Houston, Tex., for plaintiffs.

Herbert L. Fenster, Lawrence M. Farrell and Raymond B. Biagini, McKenna, Conner & Cuneo, Washington, D.C., for defendant.

## MEMORANDUM OPINION CONTAINING FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT M. PARKER, District Judge.

This case was tried to the Court. It is a case arising under the Death On The High Seas Act, 46 U.S.C. Sec. 761 et seq. and Federal Admiralty Law, 28 U.S.C. Sec. 1333. The Court now enters the following findings of fact and conclusions of law based upon the evidence presented.

### A. THE FACTS

On the night of January 16, 1982, five Navy divers lost their lives in an accident aboard a Navy submarine, the USS GRAYBACK. The cause of death was vacuum induced bends. The accident occurred in the starboard hangar diving chamber of the GRAYBACK as the divers were preparing to exit the flooded chamber into the dry side of the hangar. To exit the chamber, it was necessary to drain the water from the wet side. This was to be accomplished by Plaintiff, Petty Officer Bloomer, who was stationed in the "control bubble," a plexiglass enclosure from which he was to open the hangar and valve to allow air into the chamber as the water drained out. After reporting the valve open, Bloomer opened the drain valve to drain the water from the hangar.

The five Navy divers died when a vacuum condition occurred as the chamber was draining. The families of four of the five deceased Navy divers brought this lawsuit against General Dynamics Corporation and the United States alleging strict liability, negligence, and breach of warranty claims.

General Dynamics also filed suit against the United States claiming that, in the event it was found liable to the Plaintiffs, the United States would be liable to General Dynamics under a contractual indemnification clause. This Court, in its September 25, 1985 order, ruled that the indemnity clause of the contracts here involved are valid and enforceable and that, therefore, the United States must as a matter of contract law indemnify General Dynamics for any adjudged liability it may have to the Plaintiffs. Such liability, however, is contingent upon whether or not this Court finds General Dynamics has met the contractual prerequisites for the claimed indemnity.

On the eve of trial, the Court, upon the government's motion, dismissed the Plaintiff's direct complaint against the United States ruling that the United States was immune from such a suit under the *Feres/Stencel* doctrine. *See Feres v. Unit-*

*ed States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), *Stencel Aero Engineering Corporation v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

The government, nonetheless, still contends that it cannot be liable to the Plaintiffs under any legal theory. However, although it may be true that the government is immune from liability in a direct suit by the Plaintiffs, the same cannot be said where the United States has knowingly and contractually waived its *Feres/Stencel* immunity with respect to the third party suit by the government contractor. *See Order and Memorandum Opinion* of May 29, 1985, discussing and disposing of this issue.

As will be discussed in more detail later, the deaths of these divers was caused chiefly by the negligence of General Dynamics in the work that it performed with respect to the design of the starboard hangar diving system aboard the GRAYBACK during the conversion of the GRAYBACK from a missile-carrying submarine to a personnel-carrying submarine during the 1960's.

The United States Navy contracted with General Dynamics for performance of the design work with respect to the conversion of the diving system because of General Dynamics' experience and expertise in the design of submarine systems. *See* Plaintiff's Ex. 152, p. 43, l. 3–17; p. 44, l. 10–17; *See also* Plaintiff's Ex. 156 p. 63, l. 7–27.

To accomplish the conversion of the GRAYBACK, the United States entered into a series of contracts with General Dynamics. *See* Plaintiff's Ex. 1 and 2. In Plaintiff's exhibit 1, the scope of the work required of General Dynamics is set forth in section 2.7.2, as follows:

> The scope of work required of the contractor for USS GRAYBACK is the furnishing of the engineering effort needed for the preparation of working drawings, including rip-out plans, planning department instruction sheets, test specifications and other documents necessary to effect conversion to APSS and SUB-

SAVE. The specific areas in which the contractors shall render assistance are: (after which are listed 24 specific areas of the GRAYBACK conversion including numerous piping, trim and drain, flood vent, ventilation, and air systems).

The responsibilities of General Dynamics with respect to the work that General Dynamics was performing under the contracts is set forth in Section 2.1.4 of the contracts which state:

> (1) The contractor shall assume full responsibility for all technical research necessary to accomplish the work specified herein.
>
> (2) All work produced is to be reviewed by the contractor to assure that the conditions set forth in this circular are complied with.
>
> (3) The contractor is responsible for all quality assurance actions pertaining to the design product, plans, etc., including inspection of the end product item before issue.

## B. NEGLIGENCE

Following the accident, the United States Navy conducted an investigation, the report and attachments of which have been introduced into evidence as Plaintiffs' Exhibits 27, 40, 41A, 41B, 41C, 42 and 43. The United States Navy found that there were four specific design deficiencies with respect to the starboard hangar diving system in the hangar diving system aboard the GRAYBACK which contributed to the accident. These four design deficiencies are stated as follows:

> 1. There is no safety interlock mechanism to prevent the opening of the hangar drain valve when the main vent valve is not fully opened.
>
> 2. The only valve position indicator on the main vent valve consists of a metal tab which is under water and cannot be seen when draining the hangar.
>
> 3. There was no remote position indicator which can be seen from the dry side of the hangar.

4. The general design of the hangar made proper maintenance of the main vent valve extremely difficult, if not impossible.

■ The Court has no quarrel with the findings of the Navy report, and for the reasons outlined below, concludes that the effort put forth by the Navy and General Dynamics in converting the GRAYBACK constituted negligence which proximately caused the deaths of the divers.

Specifically, General Dynamics was negligent in failing to:

1. provide for a safety interlock device to prevent the opening of the hangar drain valve when the main vent valve is not fully opened;

2. provide for a valve position indicator that is visible when draining the hangar;

3. provide for a remote position indicator which can be seen from the dry side of the hangar;

4. design the hangar so that the main hangar valve could be properly maintained;

5. adhere to the Navy's circular of requirements (COR) calling for the vent valve to be placed inside the control bubble rather than outside as was actually done;

6. warn the Navy about the dangers associated with the design's potential to create a partial vacuum; and

7. warn or instruct the Navy concerning its failure to provide for basic safety features such as safety interlocks, vacuum guages, and vent valve open/close indicator lights in the Navy's COR.

Specifically, the Navy was negligent in failing to:

1. provide for basic safety features in its COR which would prevent a partial vacuum from occurring;

2. perform sufficient operational testing;

3. conduct a formal design review of the system; and

4. properly lubricate and maintain the shaft to the main hangar vent valve.

The Court apportions the negligence as follows: 80 percent of the fault is attributable to General Dynamics, 20 percent of the fault is attributable to the Navy. Such a finding as to the Navy, however, is merely superfluous as the Court has already ruled that the United States is immune from the Plaintiff's direct suit under the *Feres/Stencel* doctrine. The Court finds no contributory negligence on the part of the Navy divers.

Before the question of damages can be reached, this Court must address General Dynamics' three contentions which, if accepted, would entitle General Dynamics to the same immunity that the Navy now possesses. The public policy question, the government contractor's defense, and the borrowed servant doctrine are discussed in turn below.

## C. THE PUBLIC POLICY CONSIDERATIONS

General Dynamics argues that as a matter of policy, the Court should exercise judicial restraint and defer to the Navy's conclusions that the design of the hangar vent system was not defective but was adequate and safe for its intended purpose and that the direct, proximate cause of the accident was Plaintiff Bloomer's failure to open the hangar vent valve. This Court does not agree.

In *Bynum v. FMC Corporation,* 770 F.2d 556 (5th Circuit 1985), the Fifth Circuit endorsed, in its entirety, the Supreme Court's admonition of judicial restraint in reviewing military decisions relating to the armed forces. Tracing the historical underpinnings of the government contract defense, the Fifth Circuit noted that the Supreme Court's emphasis "on judicial restraint in military matters is, of course, not suprising." *Id.* at 562. The Court stated that:

It has long been recognized that interference by civilian courts with military authority inevitably raises both questions

about judicial competency in this area and separation of powers concerns.

The Fifth Circuit found that the same policy considerations underlying the *Feres/Stencel* doctrine also are at issue "whether the named defendant happens to be the government or the military contractor." *Id.* at 565. The most important policy consideration in either case is that "civilian courts would be compelled to second guess professional military judgment concerning, at least, the proper equipping of the armed services." *Id.*

■ Public policy, however, does not require any judicial restraint in this case simply because this Court is not reviewing military decisions relating to the armed forces. The Plaintiffs are not challenging a military decision concerning military operations. The issue is a design decision concerning design defects in the diving hangar aboard the GRAYBACK made by General Dynamics designers. This was purely a non-military decision requiring no military expertise. Nor was there a conscious decision on the part of the military to accept a known hazard because of military considerations.

By example, if the Army had contracted for the design of a tank desiring speed and mobility in combat it might conclude that the tank must be designed with less armor to reduce weight so as to maximize speed and mobility. Less armor, of course, would offer more risk and less protection to the servicemen inside the tank, but this is clearly a conscious military decision on the part of the Army to accept a known hazard because of the Army's desire for speed and mobility of its tank in combat. Such a decision would not be reviewable in this Court's opinion. That is not the case here. No evidence has been presented to show that the Navy consciously decided on this specific diving system design for military reasons, e.g., to reduce noise under water so as to avoid detection by the enemy.

Furthermore, the Court has found no authority to the effect that the accident reports by the military are conclusive on

liability. There are very few cases which even discuss whether military accident reports should be given conclusive weight. The general rule that reports by the military are *not* binding on the courts is stated by the Fifth Circuit in *Mac Towing, Inc. v. American Commercial Lines*, 670 F.2d 543, 547 (5th Cir.1982).

Finally, General Dynamics and the Navy contend that even if the Court does not defer to the Navy's conclusions, considerations of public policy demand that mere approval by the government of a contractor's design be sufficient to preclude recovery by the plaintiffs. As is discussed more fully later, this Court is not persuaded that mere approval from a public policy standpoint is sufficient to preclude recovery.

## D. THE GOVERNMENT CONTRACTOR'S DEFENSE

General Dynamics contends that the government contractor's defense shields General Dynamics from any liability to the Plaintiffs in negligence. This Court disagrees.

*The Law*

■ The burden of proof regarding the availability of the government contractor's defense rests with General Dynamics. *McKay v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir.1983), *cert. denied*, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). General Dynamics must prove each element of the defense by preponderance of the evidence. *Id.* at 453.

In *Bynum*, the Fifth Circuit recognized the government contractor's defense as a matter of federal common law. To establish the government contractor's defense, a military contractor must:

1. First, demonstrate that the government is immune from liability under the *Feres/Stencel* Doctrine ...

2. Second, the military contractor must prove that the government established reasonably precise specifications for the allegedly defective military equipment

3. and that the equipment conformed to those specifications ...

4. Finally, it must be shown that the military contractor warned the government about errors in the government specifications or in dangers involved in the use of the equipment that were known to the contractor but not known to the government.

*Id.* at 574.

The Fifth Circuit's four-prong test conforms to the trend in the law on the government contractor's defense as represented by the Third Circuit's decisions in *Koutsoubos v. Boeing Vertol,* 755 F.2d 352 (3rd Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985) and *In Re Air Crash Disaster at Mannheim, Germany,* 769 F.2d 115 (3rd Cir.1985); the Seventh Circuit's holding in *Tillett v. J.I. Case Co.,* 756 F.2d 591 (7th Cir.1985); the Ninth Circuit's decision in *McKay v. Rockwell International Corp.,* 704 F.2d 444 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984) and the Eleventh Circuit's decision in *Burgess v. Colorado Serum Co.,* 772 F.2d 844 (11th Cir.1985).

■ In the instant case, General Dynamics has failed to establish by a preponderance of the evidence that the government contractor's defense applies. Although General Dynamics has demonstrated that the government is immune from suit under the *Feres/Stencel* doctrine, meeting the first prong, it cannot meet the second prong because it was General Dynamics and not the Navy, who ultimately "established reasonably precise specifications" for the diving system. *Bynum,* 770 F.2d at 574. Given this finding, the third prong of *Bynum* is not even implicated. As to the final prong, General Dynamics failed not only to warn of the danger of a partial vacuum but also failed to warn of design deficiencies in the Navy's general requirements. Each prong is discussed in turn below.

*The Law Applied*

■ 1. The first requirement of the government contractor's defense is the presence of *Feres/Stencel* immunity on the part of the government. *Feres/Stencel* immunity requires that a Plaintiff's complaint arise from an injury to a serviceman in the course of activity incident to military service. *Stencel,* 431 U.S. at 673, 97 S.Ct. at 2058; *Feres,* 340 U.S. at 146, 71 S.Ct. at 159. In this case, Plaintiff's complaint arises from the death of servicemen caused by a partial vacuum in the submarine starboard hangar diving chamber which the servicemen were in incident to their service in the United States Navy. This case, thus, falls squarely within the protective shield created by *Feres/Stencel* doctrine. Accordingly, the government is immune from liability to the Plaintiffs.

2. The second element of the government contractor's defense, as the Ninth Circuit formulated the defense in *McKay,* 704 F.2d at 451, is establishment or approval by the United States government of reasonably precise specifications for the allegedly defective product. In this case, General Dynamics contends that the Navy established the specifications for the diving chamber by either preparing them itself or by reviewing in detail and approving those prepared by General Dynamics employees. For the reasons discussed below, this Court does not agree that the Navy established these specifications or approved them.

a. The Establishment Question

Under *Bynum,* it is clear that when the product is "manufactured in accordance with precise design specifications furnished by the ... government," the second prong of the government contractor's defense is satisfied. *Id.* at 574 n. 23. *Bynum,* however, did not address the "extent to which the government must participate in generating the design specifications of the military equipment before the government contractor's defense would be applicable," which is directly at issue in this case. *Id.*

The contracts involved here left design entirely to the discretion of General Dynamics. The Navy set only general per-

formance standards leaving the details to General Dynamics. Specifically, the United States provided General Dynamics with mere skeletal guidelines embodied in the COR and schematic line drawings. *See* Plaintiff's Ex. 38 & 39. However, less than two pages of the COR refer to the conversion of the diving hangar while the line drawings consist of only a one page diagram of the flood and drain system. These general guidelines did not specify the precise location of the main hangar vent valve and were silent on the existence of vacuum gauges, indicator lights, or safety interlocks for the main hangar flood and drain system. The evidence shows that such determinations were left to the discretion and expertise of the General Dynamics designers assigned to prepare the working drawings.

The Court credits the testimony of Mr. Bill Milwee, the Plaintiff's expert, and is persuaded that General Dynamics' designers had to use a great deal of expertise and discretion in converting the information provided by the Navy into working drawings. *See* Plaintiff's Ex. 5–10. The Court is also persuaded by the testimony of Mr. Urbani and Mr. Reall, both General Dynamics employees, and finds that because the system diagrams were not very detailed, General Dynamics had to use their own specialized knowledge in converting the diagrams into working drawings. *See* Urbani depo. p. 18; *Reall* depo. p. 31, l. 6–10.

With this sparse information, General Dynamics produced 71 pages of highly detailed working drawings for the starboard hangar diving system. Under such circumstances, where "only minimal or very general requirements are set for the contractor by the United States" it cannot be seriously maintained by General Dynamics that it was the government and not General Dynamics who "established reasonably precise specifications" *McKay* 704 F.2d at 450; *cf. Price v. Tempo, Inc.*, 603 F.Supp. 1359, 1363 (E.D.Pa.1985). Simply concluding, however, that these plans were reasonably detailed specifications of General Dynamics does not dispose of the second prong of the government contractor's defense since the trend in the law is to interpret the phrase "established by the government" as including the situation where the government, after having conducted a detailed review, approves drawings and specifications on which the contractor assisted.

### b. The Approval Question

From a factual standpoint, the level of review here was not sufficient to constitute "approval". *Koutsoubous* and *Mannheim* definitively analyzed this standard of proof. In *Koutsoubous*, a helicopter manufactured by Boeing Vertol crashed causing the deaths of several Navy pilots. In granting Boeing's motion for summary judgment on the government contractor's defense, the District Court concluded that the Navy had established the specifications by approving them after a substantial review and that Boeing had complied with the specifications. *See Koutsoubous*, Memorandum Decision p. 7A, note 4, Dec. 22, 1982.

In affirming the District Court, the Third Circuit concluded that "government approval of the specifications" means the process by which the government "examines and agrees to a detailed description of the workings of the system." *Koutsoubous* 755 F.2d at 355. In *Koutsoubous*, the Third Circuit noted that the District Court found a "continous back and forth relationship between Boeing and the Navy with the Navy always, expectedly and properly, having the responsibility for and exercising responsibility for making final decisions as to the specifications." *Id.*

Five months later, the Third Circuit in *Mannheim* reaffirmed *Koutsoubous* on the "approval" standard. In *Mannheim*, forty-six persons were killed when a helicopter manufactured by Boeing crashed. The Third Circuit, stated:

> The government contractor defense is available to a contractor that participates in the design of the product, so long as the government's approval consists of more than a mere rubber stamp. The defense is available so long as there is

*true government participation* in the design.

769 F.2d at 122 (emphasis added). The Third Circuit then ordered the District Court to enter judgment for Boeing on the basis of the government contractor's defense.

If approval of the design of military hardware by examining agreeing to a detailed description of the working drawings of the system is sufficient to satisfy the requirements of the government contractor's defense, then there was no such "approval" under the facts of the case. Although the government's review did involve some subjective evaluation of the contents of the plans, the level of examination did not equate to the amount of engineering expertise required by General Dynamics to prepare the plans. Therefore, this Court concludes that "true government participation in the design" necessary to constitute approval was lacking. *Mannheim,* 769 F.2d at 122.

Under *Bynum's* balancing test, General Dynamics' level of participation in the design so outweighed the government's level of participation that it was General Dynamics, who was ultimately responsible for the "reasonably precise specifications" involved here. *Id.* at 574. In the real world, although the government and the contractor may jointly work together in producing specifications, the level of participation always varies. Sometimes the government's participation is minimal at best. That is the very case here.

Given the disparity in the level of expertise between the Navy and General Dynamics and the "imbalance of knowledge" about the safety deficiencies in the design at the time General Dynamics' specifications were approved, it cannot be seriously argued that the Navy engaged in any "substantial review of the specifications." *Mannheim,* 769 F.2d at 123; *See Also Shaw v. Grumman Aerospace Corp.,* 593 F.Supp. 1066, 1074 (S.D.Fla.1984).

The most telling evidence of the limited review which the work of General Dynamics' designers and engineers received is Plaintiff's Exhibit 28. This exhibit is a memo prepared by Paul Lawrence to his superiors at Mare Island Naval Shipyard which discusses the history of the GRAYBACK design. Mr. Lawrence was the section leader of the group which prepared the hangar flood and drain system drawings. On page 4, paragraph (e), Mr. Lawrence stated, "Most of the GRAYBACK design work was accomplished by farmed-in contractor personnel and not checked by Mare Island experienced technical people."

General Dynamics was hired for the expertise and the experience it possessed. The government neither possessed the qualifications nor the ability to engage in any substantial review of General Dynamics' specifications. Moreover, the design decisions, material to the defects alleged, required no military expertise, therefore, there is no justification for insulating General Dynamics from liability where the government merely approves of the decision. "In any case, mere Navy approval of the detailed design specifications and drawings developed by General Dynamics does not make the government contractor's defense available to it." *Shaw,* 593 F.Supp. at 1074. If it did then under *Koutsoubous* and *Mannheim,* the government contractor's defense would seem always to apply and contractors would never be liable for a defective product because the government would always be in the position to approve a contractor design. The government's approval in this case is no different from the approval of any product or design prepared for the government. If that type of approval is sufficient to satisfy the second prong, then there would never be a recovery under any circumstances against defense contractors. Where the government has only given mere approval, *Bynum* does not contemplate no recovery under any circumstances against defense contractors. *Id.* at 574 N. 23.

3. The third element of the defense is compliance with the government's specifications. This prong is not implicated in this case because it was General Dynamics and not the government who established

"reasonably precise specifications" for the defective design. This Court notes, however, that the system as designed by General Dynamics *did not even* conform to the general requirements provided by the government. Specifically, the COR required that the main hangar vent valve be "controllable from the air bubble and the berthing space." *See* Plaintiff's Ex. 28, p. 223, l. 95. The design of the system by General Dynamics did not conform to this requirement. The working drawings of the system prepared by General Dynamics shows the main hangar vent valve located on the vent pipe at a 45 degree angle. *See* Plaintiff's Ex. 6. The testimony of the witnesses in this case forces the conclusion that the General Dynamics designer intended that the valve control handle be located outside the control bubble and berthing space, despite the government's instructions to the contrary. This is where, in fact, the valve was located at the time of the accident.

4. Finally, to satisfy the fourth and final prong of the government contractor's defense, General Dynamics has the burden to prove that it "warned the United States about patent errors in the government's specifications or about dangers involved in the use of the equipment that were known to the contractor but not to the United States." *Bynum*, 770 at 574. The fact that there was no warning is undisputed.

The Navy hired General Dynamics specifically because it had specialized knowledge of submarine design. General Dynamics assumed the responsibility of advising and warning the Navy on the safety aspects of the systems that General Dynamics was designing. *See* Plaintiff's Ex. 30. Both the Navy and General Dynamics knew or should have known of the dangers associated with the system's potential to create a partial vacuum absent basic safety features. The creation of a vacuum and its effect on humans is a fundamental engineering principle deserving no further comment. If either General Dynamics or the Navy had paid sufficient attention to the COR or the working drawings or had engaged in any quality assurance or opera-

tional testing procedures, the problem of a partial vacuum would have been obvious. General Dynamics, however, failed to warn the Navy about patent errors in the government's general requirements or their own working drawings.

Specifically, General Dynamics did not warn the Navy of its failure in the general requirements to provide for basic safety features such as: 1) safety interlocks, 2) vacuum guages, or 3) vent valve open/close indicator lights. In the final analysis, although the Navy's failure to perform sufficient operational testing or to conduct a formal design review before putting the system into operation constitutes negligence as it would have discovered the system's potential to create a partial vacuum, it does not dismiss the fact that the obligation to perform the technical research necessary for the design conversion of the GRAYBACK and to identify any hazards fell fully on the shoulders of General Dynamics. *See* Plaintiff's Ex. 1–3. Thus, General Dynamics has failed to satisfy the fourth prong of the defense.

In summary, General Dynamics has only established the first prong of the four-part test. Thus, the government contractor's defense does not apply. "Federal law provides no defense to the military contractor that mismanufactures military equipment or that it is itself ultimately responsible for the design defect." *Bynum*, 770 F.2d at 574. In this case, General Dynamics, rather than the government, was ultimately responsible for the design defects in the driving hangar aboard the GRAYBACK which were the proximate cause of the accident in question. Thus, General Dynamics is not entitled to stand under the umbrella of sovereign immunity with the government and must be held accountable for its negligent acts and omissions.

## E. THE BORROWED SERVANT DOCTRINE

General Dynamics next argues that even if the Court concludes that the government contractor's defense does not apply, Gener-

al Dynamics cannot be found liable to the Plaintiffs for the injuries they sustained as a matter of law because the employees involved in the GRAYBACK conversion were not acting as General Dynamics employees, but instead were borrowed servants of the government. This Court disagrees.

### The Law

In the Fifth Circuit, the test of whether or not a person is a borrowed servant is factual. *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir.1985); *Ruiz v. Shell Oil Company*, 413 F.2d 310, 312–13 (5th Cir.1969). "The central question involving servant cases is whether someone has the power and control to direct another person in the performance of his work". *Herbron v. Union Oil Company of California*, 634 F.2d, 245, 247 (5th Cir.1981). The test to determine whether a borrowed servant relationship exists requires consideration of a variety of factors, none of which is conclusive or decisive. *See Ruiz v. Shell Oil Company*, 413 F.2d, 310 (5th Cir.1969).

### The Law Applied

1. It is legally impermissible for the government to contract non-governmental employees who are merely to receive their assignments from government personnel because this is a violation of the Civil Service laws. *See* 5 U.S.C. § 3109. However, even though the master/servant relationship was proscribed, the Court may still find that such a relationship did, in fact, exist between Mare Island Naval shipyards and the General Dynamics employees. Under the facts of this case, however, the Court cannot do so.

2. The United States Navy hired General Dynamics specifically because its employees were experienced and would not need supervision. Although there was cooperation between the Navy personnel and General Dynamics personnel, the Navy did not intend to control or supervise the particulars or actual details of General Dynamics employees' work. General Dynamics was hired without any competitive bid-

ding specifically because General Dynamics had specialized knowledge in submarine piping design and would, therefore, not need close supervision in performing the discretionary design work. In determining whether an employee is a borrowed servant, cooperation between the employee and the alleged borrowing employer, as distinguished from subordination, is not enough to create an employment relationship. *See Standard Oil Company v. Anderson*, 212 U.S. 215, 226, 29 S.Ct. 252, 256, 53 L.Ed. 480 (1909).

3. The contracts themselves evidence the intention not to create a borrowed servant relationship. If the parties to the contracts had intended the General Dynamics designers and engineers to be borrowed servants of the Navy, and to work under government scrutiny with their tasks chosen at the whim of the Navy depending upon day-to-day needs, there would have been no need to define what work needed to be performed or to describe the scope of the work. However, in all three contracts the responsibilities of General Dynamics is set out with great specificity. *See* Plaintiff's Ex. 1, Sec. 2.1.4 of Contract No. 0221, Plaintiff's Ex. 2 of Contract No. 1212, and Plaintiff's Ex. 3, Sec. 1.4 of Contract No. 1832; *See Also* Plaintiffs' Ex. 1, Sec. 2.7.2. If the parties to these contracts had intended that General Dynamics' designers would receive their instructions on a day-to-day basis from Mare Island supervisors, there would have been no need to describe General Dynamics' specific areas of responsibility in the agreement.

4. General Dynamics maintained its employer/employee relationship and retained the obligation to pay General Dynamics employees. The General Dynamics employees assigned to the GRAYBACK conversion at Mare Island did not acquiesce to becoming government employees. The Court is persuaded by Mr. Reall's testimony and concludes that he considered himself a General Dynamics' employee at all times. *See* Reall depo. at p. 261, l. 16–18. Nor did General Dynamics terminate its relationship with its employees. General

Dynamics maintained an administrative structure which was headed by Mr. Conway Davis, the General Dynamics supervisor at Mare Island, whose second in command was Mr. Robert Urbani. The travel arrangements, housing, personnel problems and pay all were the concern of General Dynamics, not that of the Navy. Also, while at Mare Island, both Mr. Conway Davis and Mr. Robert Reall received their pay, from General Dynamics, not from the Navy.

■ Given these facts, the Court concludes that General Dynamics was an independent contractor given discretionary, independent decision-making authority and, therefore, its employees were not borrowed servants of the government.

## F. THE PRECONDITION TO THE GOVERNMENT'S LIABILITY

The contracts between General Dynamics and the United States contain preconditions for indemnity set forth in Standard Clause 21, entitled Insurance Liability to Third Persons. This clause provides at (c) that the contractor shall be reimbursed "for liability to third persons ... for death or bodily injury," which are "not compensated by insurance or otherwise ... *provided* such liability is represented by final judgments." (Emphasis in original). Absent stipulation of the parties, this Court will conduct an evidentary hearing in order to make findings as to whether or not General Dynamics has met the contractual prerequisite for the claimed indemnity.

## G. DAMAGES

The Court is persuaded that each party's evaluation of damages incurred in this case is not significantly different. Therefore, the Court extends a period of 30 days to the parties to confer in order to reach a stipulation or to make a joint recommendation as to what the award of damages should be. The Court, of course, expects none of the parties to waive any of their possible defenses or rights by engaging in this process of negotiation.

## H. A RECENT DECISION

One of the primary issues in this case is the application of the government contractor's defense. Subsequent to the time this order was prepared but prior to filing, the Eleventh Circuit handed down it's decision in *Shaw v. Grumman,* 778 F.2d 736 (11th Cir.1985) addressing this very issue. The threshold question before the Court, according to Judge Johnson, was whether the United States had actually made an informed decision to use a particular military product despite knowledge of the inherent risks. In affirming the District Court's judgment for the Plaintiff, Judge Johnson concluded that "although the Navy did formally approve Grumman ... [Aerospace Corporation's] specifications and design changes, that approval did not constitute the sort of informed military decision to accept the risk of dangerous product to which this Court must defer under separation of powers doctrine." *Id.* at 747.

Although the Eleventh Circuit test is different from the test set forth in the *Bynum* decision, it is reasonably calculated to produce the same result: to place liabliity upon the party ultimately responsible for the defect. Nothing in the Judge Johnson decision is inconsistent with what has been done in this case. Here, no such informed decision was made by the United States Navy when it employed the General Dynamics' design of the hangar, flood, and drain system on board the USS GRAYBACK. Liability has been fairly placed upon the party "ultimately responsible for the design defect." *Bynum,* 770 F.2d at 574.