**MERRITT, CHAPMAN & SCOTT CORPORATION, a Corporation, and The Savin Construction Corporation, a Corporation, Appellants,**

v.

**GUY F. ATKINSON COMPANY, a Corporation, Appellee.**

**No. 17056.**

United States Court of Appeals Ninth Circuit.

Sept. 22, 1961.

Bronson, Bronson & McKinnon by Harold R. McKinnon, San Francisco, Cal., for appellants.

Johnson & Stanton and Gardiner Johnson, Thomas E. Stanton, Jr., and Marshall A. Staunton, San Francisco, Cal., for appellee.

Before BARNES, JERTBERG and MERRILL, Circuit Judges.

BARNES, Circuit Judge.

This is a diversity case wherein the district court had jurisdiction pursuant to 28 U.S.C. § 1332, and this court has jurisdiction on appeal under 28 U.S.C. § 1291.

Appellants contracted to build the Folsom Dam, located on the American River fifteen miles east of Sacramento, California. This required the construction of a temporary or cofferdam above and one below the permanent dam site. A diversion tunnel from the upper cofferdam was required to divert the water below the lower cofferdam. The latter was to prevent backing up of water from below into the area where the permanent dam was being constructed.

Appellants raise two points: I—The "government contract defense," and II—that certain damages were improper.

It was the collapse of the upper cofferdam on two occasions (January 9, 1953, and May 20, 1953) which damaged appellee's intermediate cellular steel cofferdam, its powerhouse installation, and the working area required therefor. Appellee was awarded damages totaling $519,-761.73.

It seems clear to this court that to enable appellants to rely on their claimed "government contract defense," their obligation must have been contained within the contract appellants executed with the government. If that contract be uncertain, or ambiguous, or in need of interpretation, then only can the court go into the "surrounding circumstances."

The government required originally only that the upstream cofferdam have a minimum crest elevation of 237 feet; the downstream cofferdam a minimum crest elevation of 218 feet; and that they be located at certain points. By "Supplemental Agreement No. 1" the government set a maximum elevation of 250 feet on the upper cofferdam.

We adopt the following language from the appellee's brief, which we find undisputed by appellants:

"As to the upstream cofferdam, the plans and specifications were silent as to details, except for the reference to the minimum crest elevation, its general location, and eventually the permissible maximum crest elevation.

"They did not require or direct anything of the Appellants as the main dam contractor. Nothing was required or directed as to the materials to be used, the construction methods to be followed, the sequence or order of construction, or any other detail.

"Neither the Corps of Engineers, nor any of its employees prepared or submitted to Appellants any plan, or even any single drawing of the upstream cofferdam (Tr. 1045). Quite to the contrary, the Specifications (Exhibit A–16A, Paragraph 1–05) provided that:

"'Details of the proposed plans for diversion and for the design of the cofferdams shall be submitted to the Contracting Officer for information only * * * prior to commencement of the construction of the cofferdams.'

"Actually only one drawing of the upstream cofferdam was ever made. Appellants' Project Manager David E. Stinson conceived and prepared it (Tr. 767–768). No other drawings or plans of the upstream cofferdam were ever prepared by anyone.

"Prior to the execution of Appellants' contract with the Corps of Engineers, on December 8, 1950, the Contracting Office, Lt. Col. C. C. Haug, wrote an interpretive letter (Exhibit G–29–A) stating that it was the intent [of the contract executed]:

"'to place the responsibility for diversion and de-watering on the Main Dam contractor except for the diversion tunnel.'

"This assignment of responsibility for diversion and de-watering to the main dam contractor (the Appellants) was never changed (Tr. 1037–1038) by any of the contract documents (which include the contract, the plans and specifications, Supplemental Agreement No. 1, and the change orders)." (Appellee's Br., pp. 3–4.)

The negligence of defendants-appellants was charged in five respects. These were:

(1) Failure to select and use proper materials in the construction of the upstream cofferdam.

(2) Failure to install cut-off walls or collars, or to use special compaction, around the discharge pipes in the upstream cofferdam.

(3) Railing the upstream cofferdam from elevation 237 to 250 during the flood season.

(4) Maintaining the upstream cofferdam without a prudent plan for the con-

trolled release of the water in the flood season.

(5) Failure to breach the upstream cofferdam and the downstream cofferdam on the days of the floods.[1]

The first three acts were finally admittedly not subject to any direct government control and were entirely within the discretion of the appellants. (Appellants' Br., p. 10; Stipulation (as to point (3) ), Tr. 1086–87.)

We find nothing in the record either by way of terms of the contract, or even "in the context of surrounding circumstances," to convince us that appellants were *required* by any government directive or authority to do that which was charged against them as negligent acts (4) and (5). We find no evidence of government compulsion with respect thereto. It is elementary that *compulsion* must exist before the "government contract defense" is available. Hence we find no error in the court having held, as a matter of law, there was no factual question to present to the jury. It was a question of law. No interpretation was required of the terms of the contract. Although appellants content themselves with repeated general statements that they were required to follow the government's instruction, appellee has specifically pointed out, by reference to the record, that:

A. Appellants had discretion in the design.

B. Appellants had freedom of selection of materials used.

C. Appellants voluntarily added the sheet-piling cut-off wall.

D. Appellants provided the discharge pipes.

E. Appellants increased the elevation of the upstream coffer- dam from 237 to 250 feet without direction from the Corps of Engineers.

The cases cited by appellants to establish the general rule of "Government contract defense" are cases in which plans and specifications were drawn and adopted *prior* to the contract. Then the contractor is entitled to follow such plans and specifications, exercising due and proper care and skill, and require parties damaged to look to the government, which has required such a contract, for relief; provided such plans and specifications are inadequate, and where there has been no departure from the plans, and when the work has not been done in an improper, careless or negligent manner by the contractor. Marin Municipal Water Dist. v. Peninsula Paving Co., 1939, 34 Cal.App.2d 647, 94 P.2d 404; Hamilton v. Harkins, 1956, 146 Cal.App. 2d 566, 304 P.2d 82; Northwestern Pac. R. Co. v. Currie, 1929, 100 Cal.App. 173, 279 P. 1057.

By the terms of appellants' contract with the government, it was provided:

"The Contractor will be responsible for loss or damage to the diversion structure, construction plant, and any part of the temporary or permanent work, due to failure or inadequacy of any part of the diversion or unwatering program, or due to overtopping of the cofferdams * * *.

After the river and local drainage have been diverted from a construction area, all water therein shall be removed by adequate pumps or other means and, upon completion of the excavation, the entire foundation area shall be maintained free from running or standing water to permit inspection of the foundation and

---

1. Appellants agree that there were five negligent acts charged, but express them differently:
 "(1) Faulty materials in the upstream cofferdam.
 "(2) Faulty protective covering around discharge pipes in the cofferdam.

"(3) Raising the cofferdam from elevation 237 to 250 in the flood season.
 "(4) Maintaining it without a prudent plan for controlled, safe release of water in the flood season.
 "(5) Failure to breach the cofferdam (also the lower cofferdam) on the day of the flood."

placing of embankment and concrete in the dry."

While it is true "the Corps wanted to hold it [the upper cofferdam] as long as they could," this did not *prevent* appellants from disregarding such wishes if they as ordinary contractors, required by their contract to make the decision as to when the cofferdam should or should not be breached, came to the conclusion it was their duty and responsibility to so breach the cofferdam. Cf. Ex. G–29–A–1, and Pltff's Ex. A–16–A, Contract, Part IV, Sec. 1. Diversion Requirements §§ 1–02, 1–03. To urge that appellants could not have breached the cofferdam earlier because "we are bound by our contract not to do so" simply is not so.

We find no error in the refusal of Instruction No. 13, and the giving of the two instructions specified as errors two and three. These were not restricted to the negligence charged within the last two of the five charges of negligence (supra).

■ This brings us to the fourth alleged error—the insufficiency of the evidence to support $110,000 of the damages awarded, being that estimated amount of "premium time and costs to avert 1954–55 winter losses" and "loss of job momentum and interference with job efficiency." Of this: $100,000 was due to the January 9, 1953, incident, and $10,000 to the May 20, 1953, incident.

The only testimony to support the four round figures,[2] say appellants, is the testimony of Mr. James. He said, with respect to the first $50,000 item:

> "That is not a calculated figure—it is an estimate based on the judgment of our management—largely premium payroll amounts for work on Saturday and Sundays, and multiple shifts per day."

How the percentages of the total alleged "premium time" of $70,000 were determined appears from the evidence. (Cf. Pltff's Exhibits A–208, A–211, and particularly the ledger sheets, Pltff's Exhibit A–209–A.) The first two were summaries, the last two specific and itemized. Further, no objection to the introduction of such evidence was made below, save in one instance, with respect to incompetency.

Appellee points to the supporting testimony of Earl M. Jennett, appellee's Project Manager, with respect to the second items of $50,000 and $5,000, respectively. These figures relate to the alleged "interference with efficiency," "lack of momentum," and "increased inefficiency" after the flooding. Again no objection was made below to this line of evidence. No evidence was presented to overcome its probative value. There is no question but that Mr. Jennett's testimony supports the fact of the occurrence of considerable damage (Tr. 457, 458). His testimony as to figures is less satisfactory.

That damages cannot be precisely or accurately measured by the person damaged, does not, in California, prevent the recovery of any damages. Hanlon D. & S. Co. v. Southern Pacific Co., 1928, 92 Cal.App. 230, at page 235, 268 P. 385; Elsbach v. Mulligan, 1924, 58 Cal.App. 2d 354, 136 P.2d 651. "A reasonable certainty only is required." Hensler v. City of Los Angeles, 1954, 124 Cal.App.2d 71, 80, 268 P.2d 12, 23. "A defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. of New York v. Southern Photo Material Co., 1927, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684.[3]

---

2. $50,000, $50,000, $5,000, and $5,000, respectively, totaling $110,000.

3. And see discussion of the modern trend of courts with respect to damages, particularly in those cases where the *extent*

of damage, rather than the *fact* of damage, is difficult to prove. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, at page 562, 51 S.Ct. 248, 75 L.Ed. 544; and Bigelow v.

We cannot, of course, give our "judicial blessing to a decision based upon speculation, surmise, and conjecture." Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427, 434. Yet by no stretch of the imagination can the testimony of either witness James or Jennett be so denominated. No rebuttal evidence on damages was offered by appellants. No objection was made by appellants. We do not find prejudicial error.

We cannot rule there existed here any such gross miscarriage of justice in awarding damages as to shock the conscience of this reviewing court.

Finding no error, judgment based on the jury's verdict is affirmed.

The motion for "Order Suspending Interest on Judgment During Appellee's Extension of Time to File Brief After June 26, 1961," is denied.

R. K. O. Radio Pictures, Inc., 1946, 327 U.S. 251, 264–265, 66 S.Ct. 574, 90 L.Ed.

652. Cf. also 78 A.L.R. 858; 25 C.J.S. Damages § 28, pp. 493–496.